Tungsten Mining Corporation v. Commissioner.
Tungsten Mining Corp. v. Commissioner
Docket No. 37144.
United States Tax Court
1953 Tax Ct. Memo LEXIS 321; 12 T.C.M. (CCH) 342; T.C.M. (RIA) 53101; March 30, 1953
*321 Paul R. Russell, Esq., 20 Exchange Place, New York, N. Y., and Richard O. Merrick, Esq., for the petitioner. Joseph F. Lawless, Esq., for the respondent. MURDOCK Memorandum Opinion MURDOCK, Judge: The Commissioner determined deficiencies in income tax of the petitioner for its fiscal years ended June 30, 1947 through 1950 as follows: Deficiency
1947
$21,144.26
1948
39,861.92
1949
48,151.37
1950
12,542.83 The issues for decision are whether amounts which the petitioner paid to the Hammes in each of the taxable years are royalties, excludible from gross income or deductible as ordinary and necessary expenses, or, in the alternative, whether the petitioner is entitled to additional allowances for depletion. Most of the facts in the case have been stipulated and they are substantially the same as those in the case of Joseph and R. H. Hamme, decided contemporaneously herewith. The facts stipulated herein are adopted as findings of fact. The petitioner filed its corporate income tax returns for the taxable years with the collector of internal revenue for the Second District of New York. Joseph and Richard H. Hamme, while prospecting, found *322 deposits containing tungsten in Vance County, North Carolina. They did not have the funds or the ability to develop the property and they leased and subleased the lands to Haile Gold Mines, Inc., by a lease dated July 31, 1943. The lease was to continue until April 15, 1944 unless sooner terminated. It gave the lessee the right to purchase from the lessors all their right, title and interest in all minerals, ores, clays, earths and stone in, under, or upon the land. The name of Haile Gold Mines, Inc., was changed to Haile Mines, Inc. and the latter entered into an agreement with the Hammes dated March 4, 1944 called an "Indenture". It provided that in consideration of the payment of $2,000 in cash and of "royalty payments and other payments contracted to be made in the future" the Hammes "bargained and sold" property consisting of equipment and of the five tracts described in the lease of July 31, 1943, "TO HAVE AND TO HOLD said leasehold, personal property and the lands above described, together with all rights, privileges and appurtenances thereunto appertaining, unto the said party of the second part, its successors, and assigns, in fee simple forever." The conveyance was made *323 subject to the condition that Haile Mines, Inc., would make payments in accordance with the terms of a contract entered into on the same date "covering royalties to be paid in the future" to the Hammes. It provided further that in case of uncured default Haile Mines, Inc., would reconvey the properties to the Hamme Group together with all rights of Haile Mines, Inc., in 256 acres of adjoining land consisting of the Scott and Sneed tracts. The instrument contained a general warranty but was subject to a deed of trust securing a note in the amount of $2,268 which liability was assumed by Haile Mines, Inc., as a part of the consideration "for this conveyance." The other agreement entered into by the same parties on March 4, 1944 is entitled "Contract". It provides that in consideration "of the conveyance of a leasehold, certain personal property and certain land made by deed of even date herewith", Haile Mines, Inc., agrees to pay the Hamme Group "in equal amounts to each of them royalties on ores, minerals, concentrates or any mineral products derived and sold from the lands or mineral rights acquired" by Haile Mines, Inc., in Townsville Township, Vance County, North Carolina, "said *324 royalties to be based on net sales or net mint or smelter returns and to be at the rate of 10% on any minerals or mineral products other than tungsten ores or concentrates, and on tungsten ores or concentrates to be at the rate of" 10, 15 or 20 per cent depending upon the WO3 content of the ore sold or milled as determined monthly. Royalty payments were to be made on the 20th of each month covering the sales for the preceding month. A minimum of $10,000 in royalties was to be paid in every six months regardless of sales, but the payments were to be cumulative so that any excess over $10,000 for a six months period would be carried forward as applicable to the minimum required for any subsequent period. There was to be a reconveyance of the properties to the Hammes in case of uncured default. Haile Mines, Inc., agreed to buy for $20,000 or less the fee to the land covered by the Morton lease if the Hammes could negotiate such a purchase and in that case the royalty under the existing Morton lease would go to the Hammes, but if it was unable to purchase the land then the Hammes were to "receive an overriding royalty of 2% on the net sales or mint or smelter returns of any mineral, ores *325 or products removed from the Morton land sold by the party of the first part [Haile Mines, Inc.] prior to the possible acquisition of the property." It was further provided that if the Hammes or the Haile Mines, Inc., acquired additional lands or leases within a radius of 10 miles of the mill, those properties would be subject to the agreement or some mutually satisfactory arrangement. Haile Mines, Inc., agreed to make reasonable efforts to acquire outstanding interests in the Sneed land, to carry on litigation to protect the boundaries of the Walker land and to reassign the Morton lease if it decided to abandon it. The petitioner was organized on April 19, 1945 by Haile Mines, Inc. to engage in the business of extracting and processing tungsten ore and selling the resulting concentrates. It began operations on June 11, 1945. The rights of Haile Mines, Inc., under the agreements of March 4, 1944, subject to the obligations thereunder, were assigned to and accepted by the petitioner on or about June 10, 1945. Haile Mines, Inc., acting for the petitioner and the Hammes, entered into an agreement dated April 15, 1947 under which the rates of payment stipulated in the contract of *326 March 4, 1944 were changed in certain particulars and it was agreed that thereafter the total payments in any one year should not exceed $125,000 or 7 1/2 per cent of net sales, whichever should be the larger. The petitioner made payments during the taxable years to the Hammes pursuant to the agreement of March 4, 1944, as amended. It treated those amounts as royalties and excluded them from gross income in its returns for the taxable years. It computed depletion and took deductions on the basis of its share of the gross income after exclusion of the sums paid to the Hammes. The following facts are found from the testimony: "The Haile interests did not want the land covered by the agreements of March 4, 1944 except as it was necessary for the conduct of mining operations in extracting the tungsten deposits. The land, exclusive of those deposits, had a value in March 1944 of from $10 to $15 an acre. It was impossible to estimate the amount of tungsten deposits contained in the properties. The parties understood that the Hammes would take the property back when Haile Mines, Inc., was finished with it." The Commissioner, in determining the deficiencies, added to income the amounts *327 which the petitioner had excluded as royalties explaining that they were "in fact payments for the purchase of property, and are therefore unallowable as deductions from gross income." The Commissioner has no confidence in the position which he has taken in this case and says that he took it "solely to protect the revenue in the event that the Court holds that the monies received by the Hamme Group (Dockets 36037 and 36038) constitute profits from the sale of a capital asset. * * * It is respondent's prime position thatthe Hamme group retained an 'economic interest' in the mineral in place by their reservation of a royalty interest. Palmer v. Bender (1933) 287 U.S. 551. Thus, the payments being royalties, they are excludible from petitioner's gross income from the 'property' under section 114 (b) (4) of the Internal Revenue Code in computing its depletion allowance and constitute ordinary royalty income subject to depletion in the hands of the Hamme group." This Court has held in the Hamme case, referred to above, that the payments were ordinary income and not capital gains, and it follows that the parties to this proceeding agree tha the petitioner's *328 contentions herein are correct. Decision will be entered under Rule 50.