JAMES RUSTON, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 32576, 32577, 33587, 33588, 33589, 36018.
Promulgated November 21, 1952.

---

[1] Proceedings of the following petitioners are consolidated herewith: James Ruston and Audrey S. Ruston, Docket No. 32577; E. W. Ruston, Docket No. 33587; Dorothy M. Ruston, Docket No. 33588; E. W. Ruston and Dorothy M. Ruston, Docket No. 33589; W. A. Wilson and Sons Construction Co., Inc., Formerly Wilson-Ingram Construction Company, Docket No. 36018.

*Charles M. Love, Esq.*, and *Charles W. Loeb, Esq.*, for the petitioners in Docket Nos. 32576, 32577, 33587, 33588, and 33589.

*Joseph W. Kiernan, Esq.*, and *George M. Nicholson, C. P. A.*, for the petitioner in Docket No. 36018.

*Rollin H. Transue, Esq.*, for the respondent.

**OPINION.**

*Issue No. 1.*

HILL, *Judge:* This issue concerns the question whether the Nuri Smokeless Coal Company, a partnership owned and operated by petitioners James Ruston and E. W. Ruston, when it entered into a contract with petitioner W. A. Wilson & Sons Construction Co., Inc., whereby the latter was to strip-mine coal from the Rustons' leased property, transferred to W. A. Wilson & Sons Construction Co. a

292

depletable interest in the coal. Applicable statutory law is contained in sections 23 (m) and 114 (b) (4) of the Internal Revenue Code.[3] This language is necessarily very broad and in situations where several taxpayers are involved the issue as to who is entitled to such a deduction is one for judicial determination. Such an issue was first raised in cases where the owner of land or the holder of mining or drilling leases transferred the mining or drilling rights to another, retaining only the right to royalty or bonus payments and the like.

In holding that the recipient of the royalty payments was entitled to deduction for depletion, the Supreme Court in the leading case of Palmer v. Bender, 287 U. S. 551, stated that the statutory language allowing the depletion deduction was sufficiently broad to provide at least for every case in which the taxpayer acquired by investment any interest in the oil (ore, coal, etc.) in place and secured by any form of legal relationship income derived from the extraction of the depletable asset to which he must look for the return of his capital. In both Palmer v. Bender, supra, and Lynch v. Alworth-Stephens Co., 267 U. S. 364, which involved a similar problem under earlier law, the Supreme Court held that the allowance for depletion is not dependent upon the particular legal form of the taxpayer's interest in the property to be depleted, and that the particular legal relationship of the parties was unimportant. In holding that the recipient of royalties

---

[3] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions :

\*　　　\*　　　\*　　　\*　　　\*　　　\*

(m). DEPLETION.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case ; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. \* \* \* In the case of leases the deductions shall be equitably apportioned between the lessor and lessee. \* \* \*
For percentage depletion allowable under this subsection, see section 114 (b), \* \* \* (4).

SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.
(b) BASIS FOR DEPLETION.—

\*　　　\*　　　\*　　　\*　　　\*　　　\*

(4) PERCENTAGE DEPLETION FOR COAL \* \* \*.—
(A) In General.—The allowance for depletion under section 23 (m) shall be, in the case of coal mines, 5 per centum, \* \* \* of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, \* \* \*.
(B) Definition of Gross Income From Property.—As used in this paragraph the term "gross income from the property" means the gross income from mining. The term "mining." as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. The term "ordinary treatment processes," as used herein, shall include the following : (i) In the case of coal—cleaning, breaking, sizing, and loading for shipment; \* \* \*.

was entitled to the deduction, the Supreme Court in *Lynch* v. *Alworth-Stephens Co., supra,* stated:

It is, of course, true that the leases here under review did not convey title to the unextracted ore deposits [citing cases] ; but it is equally true that such leases, conferring upon the lessee the exclusive possession of the deposits and the valuable right of removing and reducing the ore to ownership, created a very real and substantial interest therein. [Citing cases]   And there can be no doubt that such an interest is property.   [Citing cases]

  *    *    *    * .   *    *    *

  *   *   *   Obviously, as the process [mining] goes on, this property interest of the lessee in the mines is lessened from year to year, as the owner's property interest in the same mines is likewise lessened.   There is an exhaustion of property in the one case as in the other ; and the extent of it, with the consequent deduction to be made, in each case is to be arrived at in the same way,   *   *   *.

In *Palmer* v. *Bender, supra,* the court emphasized that the important consideration is that the taxpayer by his lease acquired the control of a valuable economic interest in the ore capable of realization as gross income by the exercise of his mining rights under the lease.

In *Kirby Petroleum Co.* v. *Commissioner,* 326 U. S. 599, where it was held that the taxpayer-lessor, who retained the right to 20 per cent of the net money profits realized by the operators of the oil properties, was entitled to an allowance for depletion, the Supreme Court stated that only a taxpayer with an economic interest in a depletable asset is entitled to the depletion allowance, and added that by this (economic interest in the asset) was meant only that under the taxpayer's contract he was required to look to the oil in place as the source of return of his capital investment, the technical title to the oil in place being unimportant.

*Burton-Sutton Oil Co.* v. *Commissioner,* 328 U. S. 25, concerned the question whether an operator of an oil lease should exclude from its gross income for depletion purposes certain payments it made to the person who granted it the oil rights.   The Supreme Court stated:

In the present case, the assignor of the petitioner before assignment had an economic interest in the oil in place through its control over extraction.   Under the contract with petitioner, its assignor retained a part of this interest—fifty per cent of net.   Like the other holders of such economic interest through royalties, the petitioner looked to the special depletion allowances of Section 114 (b) (3) to return whatever capital investment it had.   The cost of that investment to the beneficiary of the depletion under Section 114 (b) (3) is unimportant.   Depletion depends only upon production.   It is the lessor's, lessee's or transferee's "possibility of profit" from the use of his rights over production, "dependent solely upon the extraction and sale of the oil," which marks an economic interest in the oil.   *   *   *

The courts have held that the capital investment or economic interest embodied in such a right is not dependent upon legal title[4] and

---

[4] *Palmer* v. *Bender, supra; Lynch* v. *Alworth-Stephens Co., supra; Burton-Sutton Oil Co.* v. *Commissioner, supra; Thomas* v. *Perkins,* 301 U. S. 655 ; *Burnet* v. *Harmel,* 287 U. S. 103.

the holder thereof may make a transfer completely divesting himself thereof [5] or he may contract away only a part of his interest therein.[6]

In the earlier cases which established the economic interest principle, the usual situation presented to the courts was one where the holder of the lease which granted the mining or drilling rights, by contract, transferred such rights to another, retaining the right to royalties and like payments dependent upon production, and the courts were usually called upon to decide the question whether the holder of the royalty and like payments dependent upon production retained a capital investment in the oil, gas, ore, coal, etc., in place. Other cases have since arisen where the question presented was whether the person performing the mining or drilling operations had in fact acquired all or any part of the economic interest in the wasting asset or whether such an operator was merely a "hireling," a person employed to perform services for the holder of the mining and drilling rights. Cf. *Spalding* v. *United States*, 97 F. 2d 697; *North Range Mining Co.*, 46 B. T. A. 296; *Caroline C. Spalding*, 35 B. T. A. 132; *Eastern Coal Corporation* v. *Yoke*, 67 F. Supp. 166; *Haddock Mining Co.* v. *United States*, 92 F. Supp. 106. While in these cases it was held that the operator had a depletable interest in the wasting asset, the decision in each case was made dependent upon the facts of that case, and it would certainly appear that the contractor who is hired merely to perform services for his employer enjoys no more than an economic advantage derived from production. Cf. *Helvering* v. *Bankline Oil Co.*, 303 U. S. 362; *Helvering* v. *O'Donnell*, 303 U. S. 370. See also *Cresson Consolidated Gold Mining & Milling Co.*, 11 T. C. 192.

The cases which we have cited in the preceding paragraph, as well as other pertinent cases, have been cited in the parties' briefs and thoroughly discussed therein and we believe that no purpose would be served in any detailed discussion of them here or in a showing how the facts of each may be distinguished from one another or from the case before us. Suffice it to say that the issue before us requires to be done what was done in the cited cases, namely, to determine from the entire record whether there was in fact transferred to the contractor, W. A. Wilson & Sons Construction Co., an economic interest in the coal. In this respect we believe that the tests set out in GCM 26290, 1950-1 C. B. 42, relied upon by the respondent, can not be considered as conclusive with respect to a coal stripper's right to a depletion deduction; however, this memorandum does set out the pertinent factors

---

[5] *Anderson* v. *Helvering*, 310 U. S. 404; *Helvering* v. *Elbe Oil Land Development Co.*, 303 U. S. 372.

[6] *Palmer* v. *Bender, supra; Lynch* v. *Alworth-Stephens Co., supra; Burton-Sutton Oil Co.* v. *Commissioner, supra; Kirby Petroleum Co.* v. *Commissioner, supra.*

to be considered in arriving at such a conclusion and it is therefore a helpful, if not controlling, guide.

From our consideration of the entire record before us, the contract between the parties, the testimony of the parties at the hearing and other pertinent documentary evidence, we are convinced and have found as a fact that the Nuri Smokeless Coal Company, owned and operated by the petitioners James Ruston and E. W. Ruston, transferred to petitioner W. A. Wilson & Sons Construction Co. an economic interest in the coal in place, thereby entitling the W. A. Wilson & Sons Construction Co. to percentage depletion on their gross income from the severance and sale of coal. We are also convinced by the record that during all the taxable periods here involved the parties both participated in different but essential phases in the production of coal.

The contract between the parties, with which they in fact complied during the taxable periods here in question, although not providing for the transfer of the leases, gave the contractor sole and exclusive right to strip coal from the mining premises until the seam should be exhausted. As consideration the contractor was to receive 83 per cent of the net selling price of the coal after deduction of a selling commission of 15 cents per ton. The contractor was obliged to furnish at its own cost and expense all materials, tools, machinery, equipment, and labor, to build all necessary roads, to make all necessary improvements incident to its operations in removing, stripping, and excavating coal, and to maintain and keep in proper repair and working order the tipple, screens, loading ramps, sidings, etc., on the property, and to screen, produce, load, process, clean, and ship the coal at its own expense.

The Nuri Smokeless Coal Company could cancel the agreement only in the event that the contractor should fail vigorously and continuously to prosecute the operations for a period of 15 consecutive days for reasons not beyond its control, or in the event that it should in any other manner breach the terms of the contract and fail to perform the duties thereunder. The contractor agreed to carry fire insurance on the equipment, machinery and appliances owned by the Nuri Smokeless Coal Company and located in and about the tipple, to carry workmen's compensation on all of its employees engaged in the prosecution of the operations, and to carry public liability and property damages insurance on the operations. The contract provided that the contractor had the right to cancel its contract by giving the Nuri Smokeless Coal Company 30 days' notice.

The Nuri Smokeless Coal Company retained the right to sell the coal through its agent and under the trade name of Nuri Smokeless Coal, and during the periods here involved the coal was in fact sold

through the selling agent of the partnership under this trade name. The partners continued to perform those other duties they had undertaken by virtue of their lease which they had not specifically delegated to the contractor, such as the payment of various taxes on the property and the payment of royalties to the lessors.

With respect to the income from the operations, the record appears to show that both parties, Nuri Smokeless Coal Company and W. A. Wilson & Sons Construction Co., looked only to the sale of coal for their income, and we believe that this is the only reasonable interpretation which could be placed upon the terms of their contract. Furthermore, the parties themselves seem to have placed this interpretation on the contract as is evidenced by the manner in which they operated with respect to the division of income from the sale of coal. We accordingly believe that the position taken by the petitioners, the Ruston group, namely, that W. A. Wilson & Sons Construction Co. was to be paid every month for coal shipped, regardless of whether or not it was sold, is untenable and is not supported by the record. No mention is made anywhere in the contract that the W. A. Wilson & Sons Construction Co. was so entitled or was ever entitled to any minimum payment whatsoever for coal mined. In this respect neither the fact that advances were made by the selling agent of the Nuri Smokeless Coal Company to W. A. Wilson & Sons Construction Co., nor the manner in which such payments were entered upon the books of the selling agent is material. Such advances are usual in commercial transactions where sellers are operating "close to the belt." Nor do we believe that the fact that legal title to the coal when severed was in the Nuri Smokeless Coal Company is controlling, since it appears implicit in the agreement that the Nuri Smokeless Coal Company would sell the coal at the best available market price and the contract required the Nuri Smokeless Coal Company to then pay over to the contractor 83 per cent of the net selling price of the coal.[7] Granting that a purpose with respect to the division of the sales proceeds may very well have been to make the contractor share the burden of any sales allowance or adjustment for coal which when inspected by the buyer contained an excessive amount of foreign matter; nonetheless, by admitting this very purpose, we believe that the Ruston petitioners have admitted that they required the contractor by such a provision to take risks as to what the ultimate selling price would be.

From a consideration of the foregoing factors, we believe that the conclusion is inescapable that the contractor here, W. A. Wilson &

---

[7] That this provision is relatively unimportant is emphasized by the fact that in *Kirby Petroleum Co.* v. *Commissioner, supra,* the person who merely reserved 20 per cent of the net money profits realized by the operators was held entitled to a depletion allowance, and in *Burton-Sutton Oil Co.* v. *Commissioner, supra,* the assignor of the operators, who was entitled to 50 per cent of the proceeds of the oil, was held to have a depletable interest.

Sons Construction Co., held an economic interest in the coal in place, and since its income, the 83 per cent of the net selling price of the coal, was from the severance and sale of the coal, such income is subject to the percentage depletion allowed by the Internal Revenue Code.

### Issue No. 2.

The second issue concerns the question whether or not the petitioner corporation, W. A. Wilson & Sons Construction Co., Inc., ever acquired an economic interest in certain leases which its predecessor partnership, W. A. Wilson & Sons, had held.

The respondent makes no objection to the requested finding of fact that the partnership, W. A. Wilson & Sons, assigned to the W. A. Wilson & Sons Construction Co. its leases on February 2, 1947, effective August 1, 1946. His position is merely that this assignment was ineffective because the partnership failed to first obtain the written consent of the Pittsburgh Consolidation Coal Company, the lessor, as was required by the terms of the leases which the partnership had with this company. We believe that this is a somewhat technical argument on the part of the respondent, but in any event it appears that the petitioner, W. A. Wilson & Sons Construction Co., Inc., has introduced sufficient evidence to establish that the conduct of the Pittsburgh Consolidation Coal Company was, after the assignment, such as to establish that it in fact consented to the assignment, thereby in effect waiving the provision for written consent. Accordingly, we hold in favor of the petitioner, W. A. Wilson & Sons Construction Co., Inc., on this issue.

*Decisions will be entered under Rule 50.*