WEIRTON ICE & COAL SUPPLY CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 43459, 43694.    Filed June 10, 1955.

*Robert P. Smith, Esq.*, and *Joseph W. Kiernan, Esq.*, for the petitioner.

*Gene W. Reardon, Esq.*, for the respondent.

OPINION.

BRUCE, *Judge:* The issue presented is whether petitioner is entitled to a percentage depletion deduction under sections 23 (m) and 114 (b) (4) of the Internal Revenue Code of 1939,[1] on the coal mined, cleaned, and delivered to National during the taxable years involved. Petitioner is entitled to the depletion deduction only if it had an "economic interest" in the coal in place. *Kirby Petroleum Co.* v. *Commissioner*, 326 U. S. 599. An "economic interest" exists in "every case in which the taxpayer has acquired, by investment, any interest in the oil [or coal] in place, and secures, by any form of legal relationship, income derived from the extraction of the oil [or coal], to which he

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions :

\* \* \* \* \* \* \*

(m) DEPLETION.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case ; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for dep'etion) shall be revised and the allowance under this subsection for subsequent taxable years shall be based upon such revised estimate. In the case of leases the deductions shall be equitably apportioned between the lessor and lessee. In the case of property held by one person for life with remainder to another person, the deduction shall be computed as if the life tenant were the absolute owner of the property and shall be allowed to the life tenant. In the case of property held in trust the allowable deduction shall be apportioned between the income beneficiaries and the trustee in accordance with the pertinent provisions of the instrument creating the trust, or, in the absence of such provisions, on the basis of the trust income allocable to each.

For percentage depletion allowable under this subsection, see section 114(b), (3) and (4).

SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

(b) BASIS FOR DEPLETION.—

\* \* \* \* \* \* \*

(4) PERCENTAGE DEPLETION FOR COAL, \* \* \*

(A) In General.—The allowance for depletion under section 23(m) shall be, in the case of coal mines, 5 per centum \* \* \* of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23(m) be less than it would be if computed without reference to this paragraph.

(B) Definition of Gross Income From Property.—As used in this paragraph the term "gross income from the property" means the gross income from mining. The term "mining", as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. The term "ordinary treatment processes", as used herein, shall include the following: (1) In the case of coal—cleaning, breaking, sizing, and loading for shipment; \* \* \*

must look for a return of his capital." *Palmer* v. *Bender*, 287 U. S. 551, 557. An "economic interest" does not require title to the asset being depleted, but it does demand the existence of some right or capital investment in the coal, oil, or other mineral in place the value of "which is necessarily reduced as the mineral is extracted." It requires that the "possibility of profit" from the use of the right be "dependent solely upon the extraction and sale" of the coal, oil, or other mineral. *Burton-Sutton Oil Co.* v. *Commissioner*, 328 U. S. 25; *Kirby Petroleum Co.* v. *Commissioner, supra.* The cost of the investment is unimportant and it makes no difference whether the return is in the form of mineral in kind or cash proceeds from the sale thereof. *Burton-Sutton Oil Co.* v. *Commissioner, supra.* "But the phrase 'economic interest' is not to be taken as embracing a mere economic advantage derived from production, through a contractual relation to the owner, by one who has no capital investment in the mineral deposit." *Helvering* v. *Bankline Oil Co.*, 303 U. S. 362.

Applying the above principles to the facts in the instant case, we have found that petitioner did not possess an "economic interest" in the coal in place. The payments received by petitioner were made pursuant to a written contract with National, the pertinent provisions of which are set forth in our Findings of Fact. Under the contract petitioner undertook to mine quantities of coal from tracts of land owned by National for the use of National in its steel plants, to clean and grade the coal and to transport the coal to National's steel plants at Weirton, West Virginia. Petitioner was to receive a specified price per ton of coal delivered—the price to be increased or decreased to reflect any material increase or decrease in petitioner's labor costs. Petitioner was to provide all equipment and to pay all expenses necessary to the performance of its services. National was to pay all taxes on the lands and on the coal removed therefrom. The contract provides, "The Contractor [petitioner] will mine and remove from National's coal lands * * * such quantities of coal as National may, from time to time, direct and will deliver the same * * *." The contract could be terminated by either party by giving 90 days' notice.

As a result of the above contract, petitioner enjoyed an advantageous relationship with National whereby it hoped and expected to derive a profit. Such a relationship, however, is not the equivalent of an "economic interest" in the coal in place. Unlike the facts in *James Ruston*, 19 T. C. 284, 295, wherein this Court held that the strip-mining contractor had an "economic interest" in the coal, petitioner did not have the "sole and exclusive right to strip coal from the mining premises until the seam should be exhausted" and petitioner's compensation was not dependent upon the selling price of the coal. See also *Helen*

*C. Brown*, 22 T. C. 58. In the two cases last cited the contractor acquired an "economic interest" in the coal by obtaining the *right* to mine *all* of the coal for which he would be paid a percentage of the proceeds derived from the sale of the coal. The value of the right thus obtained was necessarily reduced by the extraction of the coal and the contractor's only " 'possibility of profit' from the use of his rights over production" was "dependent solely upon the extraction and sale" of the coal. *Burton-Sutton Oil Co.* v. *Commissioner, supra.* Here the petitioner could mine the coal only if directed to do so by National, and National could terminate the contract at any time on 90 days' notice. Under these circumstances petitioner did not have any rights over the production of the coal and under the contract it did not acquire any right, interest, or investment, the value of which was necessarily reduced as the coal was extracted. Furthermore, during the taxable years petitioner was being paid, not for the coal, but for its services in mining, cleaning, and delivering the coal to the owner and ultimate user. Variations in the amount of the payments depended upon changing costs and not market fluctuations. Petitioner had no right to be paid in kind and the payments were not made out of the proceeds from the sale of the coal.

Petitioner contends that the contract with National was the equivalent of a lease, citing *Eastern Coal Corporation* v. *Yoke*, 67 F. Supp. 166. We disagree. The contract in question not only bears no resemblance to a lease, but it would be an unusual lease that permitted the lessee to mine only such coal as the lessor directs, required the delivery to the lessor of all the coal so mined, and granted the lessor the right to terminate the lease at any time on 90 days' notice. Furthermore, unlike the *Eastern Coal Corporation* case, National, as the owner, paid all of the taxes on the land and on the coal.

The present situation is also entirely different from that existing in *North Range Mining Co.*, 46 B. T. A. 296. There, the lessee of certain iron mines was required to mine and deliver to the lessor iron ore in amounts required by the lessor at a stated price per ton, but the lessee could also mine and sell to third parties as much iron ore as it wished by paying a royalty to the lessor. This latter right was held to give the lessee an "economic interest" in the entire mineral deposit. Cf. *Morrisdale Coal Mining Co.*, 19 T. C. 208 (on appeal C. A. 3).

Petitioner stresses the fact that it entered into an indenture with National whereby the latter reconveyed the surface rights to petitioner, that it received no interference or directions from National with regard to the performance of its services, that it conducted the mining operations in exactly the same manner as it did on its own lands, and that it made sizable expenditures for roads and insurance

and had a large investment in the equipment which was used in the performance of its services. In our opinion none of these factors gave petitioner an "economic interest" in the coal in place in the taxable years involved. During those years petitioner's prior ownership of the land, which petitioner had sold to National thereby recouping its .capital investment, did not change the fact that petitioner had only such rights in the coal as are embodied in the contract. Similarly, the "indenture," executed on December 14 of the last taxable year involved, did not give petitioner any interest in the coal, for National specifically reserved all rights in the coal. Furthermore, the discretion and independence which is allowed an independent contractor in the performance of his services and the similarity between those services and the conduct of like operations on the contractor's own lands, have no bearing upon whether the contractor has an "economic interest" in the coal which he is extracting for another. Also, whether a contractor has an economic interest in the coal in place does not depend upon the size of the operation, the cost of the equipment employed, or the amount of expenses incurred in getting out the coal. Cf. *Mammoth Coal Co.*, 22 T. C. 571 (on appeal C. A. 3). Such amounts are recoverable through deductions for depreciation and business expenses and are not an investment which must be recovered through depletion. Also, as petitioner was engaged in the business of contract hauling, was engaged in strip-mining operations on its own lands, and was in the business of renting trucks and equipment, the equipment used in the performance of its services for National could undoubtedly have been profitably employed elsewhere; and the roads were extended only as mining operations grew further from the tipple.

In every material respect the facts herein are virtually on all fours with *Morrisdale Coal Mining Co.* and *Mammoth Coal Co.*, both *supra*, wherein this Court held that the respective strip-mining contractors involved did not acquire an "economic interest" in the coal in place. On the basis of the reasoning in the above two cases we have found as an ultimate fact that petitioner did not possess an "economic interest" in the coal on the lands of National. In the *Mammoth Coal Co.* case this Court distinguished for factual differences *Gregory Run Coal Co.* v. *Commissioner*, 212 F. 2d 52, certiorari denied 348 U. S. 828, reversing in part *J. E. Vincent*, 19 T. C. 501, relied on by petitioner. We think the instant proceeding is likewise distinguishable. It follows that petitioner is not entitled to the claimed depletion deduction.

*Decisions will be entered under Rule 50.*