THE VIRGINIA B. COAL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 52159. Filed January 30, 1956.

*William T. Hancock, Esq.,* for the petitioner.
*James F. Shea, Esq.,* for the respondent.

OPINION.

Rice, *Judge:* The sole issue is whether Swaney and Blythe possessed only an economic advantage in the coal which they mined or whether they possessed a real economic interest therein. If they possessed only an economic advantage from their strip mining, petitioner retained the full economic interest in all the coal which they mined. If, on the other hand, Swaney and Blythe possessed an economic interest, petitioner, in computing its percentage depletion allowance as

provided by sections 23 (m) and 114 (b) (4) of the 1939 Code,[1] must deduct the amounts paid to them from its gross income. We found as a fact that Swaney and Blythe did possess an economic interest in the coal which they strip mined.

This issue has been before us a number of times. In several cases, we have found that independent contractors engaged in strip-mining operations possessed no economic interest in the coal which they mined because they were mere "hirelings" who performed services for the holder of the mining rights. *Weirton Ice & Coal Supply Co.*, 24 T. C. 374 (1955), on appeal C. A. 4, October 21, 1955; *Morrisdale Coal Mining Co.*, 19 T. C. 208 (1952). In other cases, we have found that the strip miners, by virtue of the agreements under which they mined, acquired a substantial economic interest in the coal and looked to a sale thereof for a recovery of their investment. *Helen C. Brown*, 22 T. C. 58 (1954); *James Ruston*, 19 T. C. 284 (1952).

We are unable to determine, from the agreements submitted in evidence, two questions which have material bearing in deciding the issue before us; namely, the quantity of coal which each independent contractor was to mine and whether such independent contractor had exclusive rights to conduct strip-mining operations on petitioner's property during the period of his agreement. Even though the answers to those questions are in doubt, we think that section 4 of the agreements, setting forth the method for computing the amounts which Swaney and Blythe were to be paid, indicates clearly that their possibility of profit and, hence, the recovery of their investment was dependent to a large extent upon the sale of the coal. And as the Court of Appeals said in *Usibelli* v. *Commissioner*, 229 F. 2d 539 (C. A. 9, 1955), affirming a Memorandum Opinion of this Court filed June 30, 1954, in speaking of the various tests applied by the courts and the Treasury to determine whether an independent contractor possesses an economic interest in the coal which he mines:

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\*     \*     \*     \*     \*     \*     \*

(m) DEPLETION.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. \* \* \*

For percentage depletion allowable under this subsection, see section 114 (b), (3) and (4).

SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

(b) BASIS FOR DEPLETION.—

\*     \*     \*     \*     \*     \*     \*

(4) PERCENTAGE DEPLETION FOR COAL, \* \* \*

(A) In General.—The allowance for depletion under section 23 (m) shall be, in the case of coal mines, 5 per centum, \* \* \* of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. \* \* \*

Prime among these tests is whether the extractor looks for his compensation to the severance and sale of the mineral or whether his compensation is dependent upon the personal covenant of those with whom he has contracted. In the former case his interest is obvious but if there is no sale of the mined mineral or no share thereof in kind * * * he receives no compensation.

We think that the agreements under which Swaney and Blythe strip mined coal from petitioner's land gave them an economic interest in the coal because the two independent contractors were dependent upon the extraction and sale of the coal, and variations in the market price thereof, for a return on their investment. Regs. 111, sec. 29.23(m)-1.[2] *Helen C. Brown, supra;* and *James Ruston, supra.*

*Decision will be entered under Rule 50.*

---

[2] REGULATIONS 111.

SEC. 29.23(m)-1. DEPLETION OF MINES, OIL AND GAS WELLS, OTHER NATURAL DEPOSITS, AND TIMBER; DEPRECIATION OF IMPROVEMENTS.—Section 23 (m) provides that there shall be allowed as a deduction in computing net income in the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements. Section 114 prescribes the bases upon which depreciation and depletion are to be allowed.

Under such provisions, the owner of an economic interest in mineral deposits or standing timber is allowed annual depletion deductions. * * *An economic interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the severance and sale of the mineral or timber, to which he must look for a return of his capital. * * *

    *       *      *      *      *      *      *

When used in these sections (29.23(m)-1 to 29.23(m)-28, inclusive) covering depletion and depreciation—

    *       *      *      *      *      *      *

(b) A "mineral property" is the mineral deposit, the development and plant necessary for its extraction, and so much of the surface of the land only as is necessary for purposes of mineral extraction. The value of a mineral property is the combined value of its component parts.

(c) The term "mineral deposit" refers to minerals in place. The cost of a mineral deposit is that proportion of the total cost of the mineral property which the value of the deposit bears to the value of the property at the time of its purchase.